# FEDERAL MEDIATION AND CONCILIATION SERVICE

| | |
|---|---|
| In the Matter of Arbitration between: | |
| AFGE LOCAL 476, | FMCS No: 191129-01975 |
| Union | Issue: LaDonna Reed-Morton Removal |
| and | |
| | Hearing: March 26 & 27, 2019 |
| U. S DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT, | Briefs: May 31, 2019 |
| Agency | Award: September 10, 2019 |

Before:  Arbitrator Blanca E. Torres

FOR THE AGENCY:   Emily Carapella, Esquire
                  David Ganz, Esquire
                  Office of General Counsel

FOR THE UNION:    Jason Weisbrot, Esquire
                  Jacob Statman, Esquire
                  Snider & Associates

## ISSUE[1]

Whether the grievant was discharged for just and sufficient cause. If not, what shall be the remedy?

Whether the grievant's discharge was based on retaliation for protected EEO activity under Title VII. If so, what shall be the remedy?

---

[1] The parties mutually agreed to an extension of time for the issuance of this Award.

## RELEVANT CONTRACTUAL PROVISIONS
## ARTICLE 12 – DISCIPLINE

Section 12.01 - General.

(1) The objective of discipline is to correct and improve employee behavior so as to promote the efficiency of the service. The parties agree to the concept of private, progressive discipline designed primarily to correct and improve employee behavior.  However, major offenses may be cause for severe action, including removal, regardless of whether previous discipline has been taken against the offending employee. Bargaining unit employees shall be the subject of disciplinary action only for just and sufficient cause.

(2) Actions shall be fair and equitable, i.e., Management shall consider the relevant factors given the circumstances of each individual case and similar cases, if any, to make a fair decision.

(3) Investigations and disciplinary actions shall be timely.  Timeliness shall be based upon the circumstances and complexity of each case.

### Definitions - Adverse Actions

(c) <u>Removal</u>. The involuntary separation of an employee from employment with the Department for misconduct reasons.

### ARTICLE 9 - Equal Employment Opportunity and Discrimination Free Workplace

Section 9.01 - Policy.

Recognizing that the mission of the Department is building strong and inclusive communities free of discrimination, the Parties commit to building the same within the Department. This is accomplished by:

> (1) Providing equal employment opportunity pursuant to all employees, to prohibit discrimination on the bases of race, color, religion, sex (including gender identity and sexual orientation based on failure to conform to sex stereotypes), age, national origin, genetic information, disability, or reprisal. This article covers employee protection from discrimination and retaliation as provided by the Title VII of the Civil Rights Act of 1964, and as amended, Age Discrimination in Employment Act (ADEA), the ADA Amendments Act of 2008, the Rehabilitation Act of 1973, the Equal Pay Act, the Genetic Information Nondiscrimination Act of 2008 (GINA), and all other laws and regulations related to unlawful discrimination.

Section 9.03 - EEO Discrimination Complaint Procedures.

> Employees who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, genetic information, or reprisal for engaging in Equal Employment Opportunity (EEO) activity may file an EEO complaint or

3.

grievance pursuant to this Article.  The parties acknowledge that employees who have discrimination complaints subject to EEOC procedures can opt to have their complaints resolved by either the negotiated grievance procedure as provided in Article 51 of this Agreement or the EEO complaint process, but not both procedures.

## **RELEVANT FEDERAL STATUTE**

Title VII of the Civil Rights Act of 1964.

(The parties' collective bargaining agreement incorporated the provisions of Title VII of the Civil Rights Act of 1964, and as amended.)

## **BACKGROUND**

The Department of Housing and Urban Development has 24 program offices.  One of those offices, the Office of Public and Indian Housing (PIH), is responsible for ensuring safe and affordable housing.  This could be done through providing vouchers for tenants to rent private housing or by funding public housing developments.  In both instances, PIH is responsible for dispersing federally appropriated funds to state and local housing authorities.  This is done through a fund assignment, which is the only way for housing authorities to receive funding.  A fund assignment is described as akin to writing a check.

Beginning in January 2017, Dominique Blom was the Deputy Assistant Secretary of PIH.  Ms. Blom was grievant's third-line supervisor.  The Office of Budge and Financial Management (OBFM) is part of PIH and supports and executes the PIH's functions.  At all times relevant to this case, Ms. Shylon Ferry-Jennings served as director of OBFM and was grievant's second line supervisor.  The OBFM is further divided into two programs:  the Budget and Program Review Division (BPRD) and the Budget Administrative Division (BAD).  Ms. Kimberly Mayo was the Director of BPRD and was the grievant's first line supervisor at the time she was removed from service.

4.

In 2015, grievant complained to the EEOC that her supervisor at the time, Ricky Valentine, then Director of OBFM, and grievant's second-line supervisor, was sexually harassing her and had retaliated against her for refusing his advances by not selecting her for a position. Thereafter, during all times relevant, the EEOC was investigating grievant's EEO complaint.

Prior to 2015, grievant had excellent employee evaluations and no disciplinary history. After filing her complaint, grievant was placed on administrative leave while her supervisor, Mr. Valentine, remained in his position. After he resigned, grievant was returned to duty. Initially, she was assigned to work with Ms. Ferry-Jennings, director of OBFM, and then was detailed to work for Ms. Mayo, director of BPRD. At all times relevant, grievant was under the direct supervision of Ms. Mayo and was subject to discipline by her. Mayo composed the notice of proposal at issue in this case, but resigned prior to its issuance. Ms. Ferry-Jennings became the proposing official and testified at the arbitration. Ms. Mayo did not testify.

## DISCIPLINARY ACTION

Grievant was originally proposed for termination based on three charges. Charge 1, Failure to Follow Instructions, had 12 specifications. Charge 2, Disruptive Behavior in the Workplace, had one specification. Charge 3, Insubordination, had two specifications. The Deciding Official dismissed Charge 2 and removed grievant based on Charge 1, specifications 1-12 (failure to follow instructions) and Charge 3, specification 1, (insubordination). See Joint Exh. 3, at 1 and Joint Exh. 6 at 1.

## FACTS, PARTIES' POSITION, AND ANALYSIS

Grievant was a GS-14 Budget Analyst who had approximately 14 years of government experience prior to her termination. Grievant's disciplinary history began in 2017 after she was

returned to work following approximately four months on administrative leave.[2] She began working under the supervision of Ms. Mayo beginning in September 2017. Tr.1 at 189. On November 2, 2017 grievant was issued a written counseling for inappropriate conduct.[3] See Jt. Ex. 3(B). On November 9, 2017 grievant was reprimanded for insubordination for copying Ms. Mayo's supervisor on e-mail communications and for disrespectful conduct. See Jt. Ex. 3, Letter of Reprimand. Grievant was instructed to attend fund assignment training on November 8, 20 and 29 and December 13, 2017 and failed to do so. She was also ordered to perform fund assignments in 2018 and failed to do so. On May 3, 2018 grievant received a 5-day suspension for failure to follow instructions for the incidents that occurred in November and December 2017. See Jt. Ex. 3.

On February 8, 2018 employee allegedly refused to attend a meeting as directed by her supervisor. Notice of a proposed 30-day suspension was issued on February 22, 2018, however the alleged February 8 incident was not included in this proposal. The alleged February 8 incident was included in the Notice of Proposed Removal dated April 20, 2018 along with her failure to perform fund assignments.

**Charge 1, Specifications 1 and 2 (Failure to follow instructions)**

As noted earlier, grievant's first line supervisor, Ms. Kimberly Mayo, did not testify or submit an affidavit. This creates serious proof issues with regard to all charges for two main reasons. First, the notice of proposal, which was originally drafted by Ms. Mayo, is not evidence. See *Copeland v. Community Services Administration*, 6 M.S.P.R. 280 (1981) ("the notice of proposal is analogous to an indictment and, thus, not evidence of the charges therein.")

---

[2] The record reflects that grievant suggested this option.
[3] This counseling letter was referenced in the letter of proposed removal but was not included in the evidence of record.

6.

The allegations in the letter of proposal must be supported by probative evidence.  Second, the proposing official, Ms. Shylon Ferry-Jennings, testified that she lacked personal knowledge of much of the misconduct at issue.  The testimony by a proposing official without personal knowledge may be discredited if the evidence lacks probative value.  See *Raybourn v. Department of Justice*, 38 M.S.P.R. 103, 108 (1988).

Specification 1 and 2 allege that grievant failed to perform fund assignments when directed to do so on April 16 and 23, 2018.  It is uncontested that grievant did not follow these instructions, claiming that she lacked sufficient training in performing fund assignments.  Agency attempted to rebut this claim by arguing, in contradictory fashion, both that grievant did not need training and that grievant had been given sufficient training.  Proposing official, Ms. Shylon Ferry-Jennings, testified that grievant "should have" known how to do fund assignments because she had served for 20 months as the director of the Budget Administration Division (BAD) which previously had responsibility for fund assignments.  Tr. 1 at 61-62.  This testimony, coupled with the agency's lack of documentation of grievant's alleged training, leads me to conclude that the agency's testimony on this issue is not credible.

Grievant testified that she was afraid that she might accidently violate the Anti Deficiency Act if she made a mistake.[4]  Tr.2 at 97.  She stated that she was "extremely anxious about going into a financial system with billions of dollars . . . when I have Ms. Mayo behind me waiting to see if I make an error so that she can ding me on that."  Tr.2 at 208.  She also testified that she had not received training in FATs.[5]  Grievant testified that she had never previously

---

[4] The Anti-Deficiency Act (ADA) is a law that bans expenditures of federal funds in advance of or in excess of appropriations.
[5] FATs is a program that was described as being a "check register" for fund assignments.  Tr. 2 at 73.

7.

performed fund assignments, but admitted that she had opportunity to review them as a supervisor. See Tr. 2 at 190, 203 and 347.

Grievant's witness, Victor Williams, a PIH budget analyst, testified that three months of on-the-job training was required to perform fund transfers. Tr.2 at 95. Further, PIH had computerized the entire fund assignment process in 2016, which agency agreed would have required some on-the-job training. Tr.2 at 63. Based on the above, I find that grievant had no prior direct experience in performing computerized fund assignments and needed extensive on-the-job training.

In order to prove the charge of failure to follow instructions, the agency must establish that the employee was given proper instructions and that the employee failed to follow them, without "regard to whether the failure was intentional or unintentional." See *Powell v. United States Postal Service*, 122 M.S.P.R. 60 (2014). With limited exceptions, the employee must follow instructions without regard to the employee's belief that the order is unlawful or improper. See e.g., *Blevins v. Department of the Army*, 26 M.S.P.R. 101, 102 (1985) (employee must follow orders and then grieve if they believe they are unlawful.) Thus, grievant's belief that she lacked training, that her supervisor might "ding" her or that she might inadvertently violate the ADA does not excuse her failure to follow orders. However, these beliefs may be considered mitigating factors when establishing the penalty. Id. at 105.

I note that despite the agency's repeated assertions regarding the critical need for grievant to perform fund assignments, these duties were abruptly removed from grievant's job responsibilities on May 21, 2018. The explanation provided by the agency was that this decision was made to "promote the efficiency of office operations." See Jt. Ex. 3 p. 102. Without any further justification by agency, I find that this explanation supports my finding that the grievant

8.

needed extensive training to perform fund assignments. In fact, the performance of fund assignments without adequate training would not necessarily promote the efficiency of office operations, and might prove to be a detriment. Based on the totality of the record, I find that agency's instruction was not a proper instruction and surely would have resulted in error. In view of this finding, I conclude that Specifications 1 and 2 cannot serve as a basis for discipline.

**Charge 1 (Specifications 3 through 9)**

According to Ms. Ferry-Jennings, grievant was improperly completing the "hot issues" section of her weekly report. Grievant had written, "LRM[6] major noteworthy individual accomplishments will be documented in year-end performance period" in the "hot issues" box. Tr. 1 at 79. Agency witnesses testified, and this is undisputed, that the weekly reports were very important for employee accountability, organizational management and funding purposes. Tr. 1 at 80-86. If grievant had no "hot issues" then, according to the instructions on the form, the required response was "none." Agency presented an e-mail allegedly from Ms. Mayo to grievant telling her that a "hot issue" response that contains a "requirement to look elsewhere" is not acceptable. The e-mail introduced into evidence does not list grievant as a recipient. See Jt. Ex. 3, p. 77.

Grievant testified that she did not receive this e-mail or talk to her supervisor about the alleged deficiencies in her report. Ms. Ferry-Jennings testified that she "didn't know" if Mayo had told the grievant about her concern about the reports. See Tr.1 at 17. She also said, I "do not know" if Grievant received the e-mail. Tr.1 at 173. Ferry-Jennings stated only that Ms. Mayo spoke with her about this. She also testified that two other employees, Harminder Jassal and Shambu said they had received the e-mail, but these employees did not testify or submit any

---

[6] LRM stands for LaDonna Reed-Morton.

statements. Tr.1 at 93. Agency argued that grievant had received instructions about weekly reports but I find that occurred in a different office and has no relevance here.

Finally, agency argues that in the absence of specific instructions from Ms. Mayo on how to fill out the form, the written instructions on the form would suffice. The written instructions indicate that if the employee had no "hot topics" to report, she should answer "none." If so, I find that it would be improper for Ms. Mayo to "stack up" instances of improperly completed weekly reports over several months (from January 26, 2018 to April 20, 2018) without informing the employee that she was not following instructions.

Although hearsay can be considered as substantial evidence, it must be reliable. The following factors are to be used in assessing the probative value of hearsay.

(1) The availability of persons with firsthand knowledge to testify at the hearing;

(2) Whether the statements of the out-of-court declarants were signed or in affidavit form, and whether anyone witnessed the signing;

(3) The agency's explanation for failing to obtain signed or sworn statements;

(4) Whether declarants were disinterested witnesses to the events, and whether the statements were routinely made;

(5) Consistency of declarants' accounts with other information in the case, internal consistency, and their consistency with each other;

(6) Whether corroboration for statements can otherwise be found in the agency record;

(7) The absence of contradictory evidence; and

(8) Credibility of declarant when he made the statement attributed to him.

See *Borninkhof v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981).

10.

In this case, none of those persons with first-hand knowledge testified or submitted signed statements or affidavits to corroborate the evidence presented. There is no explanation from agency for its failure to obtain signed or sworn statements. The agency does not allege that email records are kept in the ordinary course of business. The agency provided no explanation as to why it could not document that grievant received the e-mail at issue. If Mayo had indeed sent an e-mail to grievant (or other subordinates) about this matter, the agency should have been able to retrieve it, or failing that, provide an explanation as to why it could not be produced.

Finally, the grievant testified under oath that Ms. Mayo did not discuss this issue with her in person nor by e-mail. Tr. 2 at 224, 229. Based on all of the above, I find the hearsay evidence provided by agency is unreliable and lacking in probative value. I find that agency failed to notify grievant of her error, depriving her of the opportunity to correct it. Based on a preponderance of the evidence, I conclude that Specifications 3-9 are not supported by the record and any resulting discipline must be set aside.

**Charge 3, Insubordination**

Agency charges that Grievant was insubordinate by refusing Ms. Mayo's order to go to a meeting on February 8, 2018. Grievant testified that she did not remember this meeting. Tr.2 at 251-252. Ms. Mayo did not testify or submit a signed statement. A co-worker, Mr. Cedric Brown, "overheard" the meeting and was the only agency witness to testify concerning it. The witness said that he was talking to Ms. Mayo in her office on February 8 and she mentioned that she wanted grievant to go to a meeting that day. Ms. Mayo left and went to talk to grievant in her cubicle. Tr.2 at 146. Ms. Mayo said to grievant to that she wanted "to remind" her "that you have a meeting to go to." Tr. 2 at 149. Mr. Brown testified that he then heard an "explosion" from grievant. He said that she was "very loud and very vulgar and very uncooperative and

11.

resistant." Tr.2 at 148.  Brown testified that Ms. Mayo's voice was very low and that he could "barely hear what Ms. Mayo was saying."  Tr. 2 at 148.  He said it was like a "kitty cat being attacked by a lion."  Tr. 2 at 155.

This testimony was similar to the report that he wrote approximately four months after the event in which he described grievant as being "unprofessional and uncooperative."  Jt. Ex 3, p. 109.  There was also a "memo to file" dated February 8 entered into evidence, stating that that grievant refused to go to training on February 8 and was "belligerent."  The author of this memo is not named but is presumed to be Ms. Mayo, who did not testify.  See Jt. Ex. 3, p. 108.  Brown testified that Ms. Mayo asked him to write his account of the incident on the same day and he agreed to write it because it was so terrible.  This does not square with his explanation that he was "too busy" to write it until four months later.  Further, if the incident had occurred as described by Mr. Brown, one would expect that the Ms. Mayo would have taken immediate action against grievant in February when she issued a notice of proposed suspension for other reasons.

Mr. Brown's testimony was also lacking in details that would have enhanced his credibility, for example, he said he could not recall the profanity he heard because he does not use profanity. Tr.2 at 171.  I have no reason to believe that Mr. Brown testified in this manner because he wanted to curry favor with his soon-to-be supervisor, as alleged by grievant.  However, Mr. Brown's apparent exaggeration of the incident undermines his credibility. *Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (1990), (noting that "exaggerations, inherent probability, self-contradiction, omissions in a purportedly complete account, imprecision and errors detract from the weight to be accorded the evidence.")

12.

Agency witnesses testified that they assumed that being "belligerent" is the equivalent of being very loud and very vulgar and very uncooperative and resistant. The dictionary definition of "belligerent" is, "exhibiting assertiveness, hostility, or combativeness." https://www.merriam-webster.com/dictionary/belligerent. It does not follow that a belligerent employee is loud or vulgar. The deciding official, Mr. Todd Richardson, testified that the Mr. Brown's recollection "swayed him" and that he did not have an issue with the fact that his report was written four months after the incident. Tr.2 at 243. He said that he believed that being "very loud, vulgar, resistant, and unwilling to attend a scheduled event" meets the definition of insubordination. Tr.2 at 281.

Curiously, the testimony regarding the alleged unprofessional and vulgar conduct of grievant is not necessary to prove a charge of insubordination. To prove a charge of insubordination, an agency must establish that the employee refused to obey the authorized order of a superior officer. See *Walker, Jr., Appellant, v. Department of the Army*, 102 M.S.P.R. 474, 479 (2006). There is insufficient probative evidence to establish this here. I conclude that a preponderance of the evidence does not support the charge of insubordination, and any discipline based on this charge is hereby set aside.

## RETALIATION CLAIM

Grievant raised the affirmative defense that her removal was in retaliation for the sexual harassment complaint she filed against her former supervisor in 2015. In addition, she filed frequent discrimination complaints against Ms. Ferry-Jennings and Ms. Mayo in 2017 and 2018. In order to prove retaliation, the grievant must show by a preponderance of the evidence that she "engaged in protected activity, accused official knew of such activity, the adverse action, could under the circumstances, have been retaliation**,** and after carefully balancing the intensity of the

13.

motive to retaliate against the gravity of the misconduct, or inadequacy of the performance of duties, a genuine nexus is established between the protected activity and the subsequent action." *Mahaffey, v. Department of Agriculture*, 105 M.S.P.R 347, 359 (2007).

In general, the appellant may meet her burden to establish her affirmative defenses using direct or circumstantial evidence, which remains the same regardless of what type of evidence she relies upon. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 178 (2009). Here, the agency's failure to present a cohesive and credible case against grievant is the most significant evidence that the removal was retaliatory. The testimony of grievant's supervisor was crucial. Yet the agency chose to proceed with the charges knowing that Ms. Mayo had left the agency. Further, agency failed to obtain signed statements or affidavits from Ms. Mayo. Finally, Ms. Ferry-Jennings should not have been the proposing official in this case as she had been involved in the grievant's original sexual harassment complaint and had been the target of several more.

I find that Ms. Ferry-Jennings displayed bias towards grievant. She testified that she found the insubordination charge believable because she had experienced similar conduct from the grievant in the past. This is not a proper basis for assessing misconduct. See *Young v. HUD*, 706 F. 3d 1372, 1377 (2013), (holding that using prior conduct to prove whether the petitioner engaged in the same conduct on another occasion is inappropriate). Ms. Ferry-Jennings testified that she did not consider any penalty other than removal. Tr. 2 at 214. She said she did not consider the Douglas Factors because she relied on Ms. Mayo's analysis. Ms. Ferry-Jennings's decision to propose removal of grievant was a foregone conclusion.

The timing of events is also probative. Grievant testified, and it is supported by agency witnesses, that she filed an EEOC complaint against Ms. Ferry-Jennings and Ms. Mayo for allegedly failing to provide her with training in January 2018. Tr. 2 at 462. This was prior to the

14.

agency's issuance of its notice of proposed suspension on February 22.  Ms. Blom submitted an affidavit to EEOC in answer to the training complaint on May 9.  Tr. 1 at 381.  Following this, the agency's efforts to make grievant perform fund assignments ended abruptly when the agency removed those duties from her.  Around the same time, the grievant asked Ms. Blom to detail her away from Ms. Mayo.  Ms. Blom testified that she denied this request because there was an agency management inquiry into grievant's claim of harassment.  Tr. 2 at 32.  This makes no sense and shows that the agency was indifferent, at best, toward grievant's work situation.  Grievant was already in a detail position as a result of her sexual harassment complaint and by this time it was obvious that grievant and her supervisor, Ms. Mayo, were experiencing a great deal of conflict.

It is also probative that the agency belatedly decided to charge grievant for misconduct in June 2018 that occurred six months earlier.  Most likely this was done to increase the justification for removing grievant.  Evidence of agency "piling" on charges may be evidence of reprisal.  See *Garst v. Department of the Army*, 56 M. S. P. R. 371, 385 (1993).

The deciding official did not properly consider grievant's charge of retaliation or the impact her work place situation had on her mental health.  Mr. Richardson rejected grievant's allegation of retaliation out of hand, testifying that he "couldn't see why a supervisor would retaliate."  Tr. 2 at 294.  He also rejected evidence that grievant was suffering from anxiety and depression, stating that there was no "nexus."  Tr. 2 at 292.  This was despite medical documentation that these conditions were, at least in part, work-related.

I note here that grievant does appear to have been a challenging employee.  She testified that she filed over 40 EEO complaints before she was terminated.  Since gievant's disciplinary record was clean and her performance was excellent prior to her sexual harassment complaint

15.

against another employee, I can only conclude that these difficulties were related, at least in part, to the agency's treatment of her after filing the complaint.

Based on the totality of the record, I conclude that the grievant engaged in protected activity and the accused agency officials knew of such activity and proposed adverse action, which under the circumstances presented, could have been retaliation. Further, after balancing the intensity of the motive to retaliate, against the gravity of the misconduct alleged, (failure to fill out a form properly; failure to perform fund assignments for lack of training; and, failure to attend a meeting), I find that a genuine nexus exists between the protected activity and the subsequent action of discharging the grievant. Such retaliation is in violation of Article 9, Section 1 of the collective bargaining agreement between the parties, as well as federal law.

To be clear, I find that the evidence in the record does not support any just or sufficient cause for adverse action, nor has it been shown that adverse action would promote the efficiency of the service. As a result, the adverse action shall be set aside and the grievant shall be made whole, including reassignment to another supervisor.

## AWARD

1. The record does not support that grievant was discharged for just and sufficient cause in order to promote the efficiency of the service, therefore the adverse action shall be set aside. Grievant shall be reinstated with full back pay and restoration of benefits.
2. Grievant has proved by preponderant evidence that her discharge was based on retaliation for filing EEO complaints, a protected activity under Title VII.
3. Grievant shall be re-assigned to a position in the same grade, step and pay as her current position, under another supervisor. I retain jurisdiction to answer any questions related to the implementation of the above remedies.

16.

4.  Upon the mutual request of the parties, I retain jurisdiction to conduct a hearing on the remedy aspect of the EEO claim in this case.  Within 5 calendar days of receiving this Award, the parties shall submit to me by e-mail, a mutually agreeable date for a hearing, to be held on or before September 27, 2019.

5.  I retain jurisdiction for 25 days for submission of attorney fee requests.

6.  Agency bears the cost of the arbitrator fees in this matter.  If for any reason the agency cannot or does not pay the arbitrator fees in full, the union shall pay the remaining balance.

*Blanca E. Torres,* Arbitrator

Date of issue:  September 10, 2019